# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

DAVID MELVIN, individually and on behalf
of all others similarly situated

          *Plaintiff,*

          *v.*

SEQUENCING, LLC**,** a California limited
liability company,

          *Defendant.*

Case No.: 1:21-cv-02194

Hon. Elaine E. Bucklo

## PLAINTIFF'S MOTION FOR AND MEMORANDUM IN SUPPORT OF CLASS CERTIFICATION

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................1

II.     BACKGROUND ....................................................................................................3

     A.     The Genetic Information Privacy Act ....................................................3

     B.     Sequencing's Website Shares Data with Third-Party Testers ..........................4

     C.     Plaintiff's Experience and Procedural History ....................................8

III.    ARGUMENT .........................................................................................................8

     A.     The Class and Subclass Are Sufficiently Numerous ...........................9

     B.     Every Aspect of the Case Turns on Sequencing's Uniform Conduct, Ensuring Common Questions of Law and Fact Predominate ........................10

     C.     Melvin's Claims Are Typical of the Class and Subclass .................................14

     D.     Melvin and His Counsel Will Adequately Represent the Class and Subclass ................................................................................................16

     E.     Class Action Is the Superior Method for Resolving This Controversy ...........19

     F.     Proposed Class and Subclass Are Ascertainable .............................................21

IV.    CONCLUSION ...................................................................................................21

## TABLE OF AUTHORITIES

**United States Supreme Court Cases**

*Am. Exp. Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013) ........................................................................................... 19

*Amgen Inc. v. Conn. Retirement Plans & Tr. Funds*,
568 U.S. 455 (2013) ............................................................................................. 8

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
559 U.S. 393 (2010) ............................................................................................. 9

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 350 (2011) ....................................................................................... 8, 10

**United States Circuit Court of Appeals Cases**

*Bell v. PNC Bank, N.A.*,
800 F.3d 360 (7th Cir. 2015) ......................................................................... 10, 11

*Messner v. Northshore Univ. HealthSys.*,
669 F.3d 802 (7th Cir. 2012) ............................................................................... 11

*Mullins v. Direct Digital, LLC*,
795 F.3d 654 (7th Cir. 2015) ................................................................... 8, 20, 21

*Muro v. Target Corp.*,
580 F.3d 485 (7th Cir. 2009) ............................................................................... 15

*Retired Chi. Police Ass'n v. City of Chi.*,
7 F.3d 584 (7th Cir. 1993) .............................................................................. 15, 16

*Spano v. The Boeing Co.*,
633 F.3d 574 (7th Cir. 2011) ............................................................................... 15

*Starr v. Chi.Cut Steakhouse, LLC*,
75 F. Supp. 3d 859 ............................................................................................... 16

*Suchanek v. Sturm Foods, Inc.*,
764 F.3d 750 (7th Cir. 2014) ............................................................................... 10

**United States District Court Cases**

*Aranda v. Carribbean Cruise Line, Inc*,
No. 12-CV-4069, 2017 WL 818854 (N.D. Ill. Mar. 2, 2017) .............................. 17

*Barnes v. Air Line Pilots Ass'n, Int'l*,
 310 F.R.D. 551 (N.D. Ill. 2015) ............................................................. 9, 20

*Bernal v. NRA Grp., LLC*,
 318 F.R.D. 64 (N.D. Ill. 2016) ..................................................... 15, 16, 20

*Birchmeier v. Carribean Cruise Line, Inc*,
 302 F.R.D. 240 (N.D. Ill. 2014) ......................................................... 19, 21

*Gomez v. Ill. State Bd. of Educ.*,
 117 F.R.D. 394 (N.D. Ill. 1987) ................................................................ 18

*Hayes v. Convergent Healthcare Recoveries, Inc.*,
 No. 14-146, 2016 WL 5867818 (C.D. Ill. Oct. 7, 2016) .......................... 20

*In re Facebook Biometric Info. Priv. Litig.*,
 326 F.R.D. 535 (N.D. Ill. 2018) ................................................................ 17

*Jackson v. Nat'l Action Fin. Servs., Inc.*,
 227 F.R.D. 284 (N.D. Ill. 2005) ................................................................ 16

*Matthews v. United Retail, Inc*,
 248 F.R.D. 210 (N.D. Ill. 2008) ................................................................ 18

*Rogers v. BNSF Ry. Co.*,
 19 C 3083, 2022 WL 854348, at *4 (N.D. Ill. Mar. 22, 2022) ................. 10

*Toney v. Quality Res., Inc.*,
 323 F.R.D. 567 (N.D. Ill. 2018) ................................................................ 19

*Ziemack v. Centel Corp.*,
 163 F.R.D. 530 (N.D. Ill. 1995) ................................................................ 16

**Miscellaneous Authorities**

45 C.F.R. § 160 ............................................................................................... 3

410 ILCS 513 ........................................................................................ *passim*

Fed. R. Civ. P. 23 .................................................................................. *passim*

Allison Grande, *Titan of the Plaintiffs Bar: Jay Edelson*,
 Law360 (Oct. 1, 2014), https://www.law360.com/articles/581584/titan-of-the-plaintiffs-bar-jay-edelson ............................................................................................. 17

Diana Novak Jones, *Illinois Powerhouse: Edelson PC*,
LAW360 (Aug. 28, 2018), https://www.law360.com/articles/1076447/illinois-powerhouse-edelson-pc ............................................................................18

Diana Novak Jones, *Illinois Powerhouse: Edelson PC*,
LAW360 (October 5, 2017), https://edelson.com/wp-content/uploads/2016/05/Illinois-Powerhouse-Edelson-PC.pdf ............................................................................18

Emma Whitford, *Titan of the Plaintiffs Bar: Jay Edelson*,
LAW360 (Mar. 31, 2021), https://www.law360.com/articles/1364448/titan-of-the-plaintiffs-bar-edelson-s-jay-edelson ............................................................................17

Laura Berg, *Titan of the Plaintiffs Bar: Jay Edelson*,
LAW360 (Apr. 26, 2023), https://www.law360.com/articles/1596891/titan-of-the-plaintiffs-bar-edelson-s-jay-edelson ............................................................................17

Lauraann Wood, *Illinois Powerhouse: Edelson*,
LAW360 (Sept. 3, 2019), https://www.law360.com/articles/1193728/illinois-powerhouse-edelson ............................................................................18

Parker Quinlan, *Cybersecurity & Privacy Group Of The Year: Edelson*,
LAW360 (Feb. 21, 2023), https://www.law360.com/articles/1567512/cybersecurity-privacy-group-of-the-year-edelson ............................................................................17

## I.    INTRODUCTION

Defendant Sequencing, LLC's[1] ("Sequencing") website allows individuals to have their DNA analyzed for a host of potential insights, including susceptibility to particular diseases, optimal nutrient intake, and genealogy. Individuals provide basic DNA testing results obtained either through Sequencing's own testing or another popular DNA analysis company (like 23andMe or AncestryDNA) to Sequencing. Then those individuals can purchase reports further analyzing their genomes, purportedly obtaining these more specific insights. The problem, alleges Plaintiff David Melvin, is that Sequencing discloses an individual's genetic information, along with some more traditional identifying information, to third parties to conduct these analyses. Sequencing failed to clearly inform its customers that this disclosure was taking place, or to obtain written authorization allowing it.

Melvin alleges that this violates the Illinois Genetic Information Privacy Act ("GIPA", or "the Act"), which prohibits disclosure of genetic testing information except for in limited circumstances, including upon execution of a written release authorizing the disclosure. *See* 410 ILCS 513/15(a), 30, 35. Because Sequencing fails to disclose clearly that third parties run nearly all of the genomic analyses offered on Sequencing's website—indeed, users do not even leave the Sequencing website when purchasing these additional analyses—or obtain written consent from users to share their genetic information, users are not fully informed that Sequencing is disclosing their genetic testing information to third parties, and users are not allowed the opportunity to make an informed choice about who receives their genetic testing information. For its part, of course, Sequencing will likely contend that the fact that these analyses are run by third parties is clearly disclosed, and someone who requests that Sequencing send their genetic

---

[1]    Counsel for Defendant represents that Big Data Arts, LLC operated the website at issue in this lawsuit. Big Data Arts, LLC then converted to Sequencing, Inc., a Delaware Corporation.

1

testing information to that third party cannot thereafter complain that they were never asked to sign a formal authorization.

The instant Motion does not ask the Court to decide between these two competing legal theories. Instead, this Motion concerns *how* this case will be resolved. Based on information provided by Sequencing in discovery, around 600 Illinoisans used Sequencing's website to purchase analyses of their DNA testing results. Because, as it relates to the GIPA, these individuals had materially identical experiences using Sequencing's website, Melvin proposes that this case be certified as a class action. More specifically, as detailed below, Melvin moves for certification of the following Class:

> All people located in the State of Illinois who, from January 28, 2020, through September 1, 2022, had their genetic test results disclosed to any third party by Sequencing.[2]

Melvin also proposes a Subclass of Class Members who purchased a DNA analysis through the Sequencing website that was actually conducted by a third-party tester, "Silverberry Genomix." As explained below, this proposed Subclass accounts for a disclosure made in connection with Silverberry Genomix's analyses, which may bear on the merits of the Subclass's claims with respect to disclosures to Silverberry Genomix.

The proposed Class and Subclass readily meet the criteria of Rule 23(a) and (b)(3). The claims turn on the uniform operation of the Sequencing website, not on conduct unique to any particular Class Member, allowing a fact finder to resolve the claims of all Class and Subclass Members in a single merits proceeding. Moreover, Melvin is a member of both the Class and Subclass, and his interests align with the proposes absent Class Members. Finally, a class action

---

[2] Excluded from the Class is (1) any Judge or Magistrate presiding over this action and members of their families, (2) Defendant, Defendant's subsidiaries, parent companies, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, (3) persons who properly execute and file a timely request for exclusion from the class, and (4) the legal representatives, successors, or assigns of any such excluded persons.

fosters efficiency and promotes uniformity of decision, and is far superior to a multitude of individual actions. The Court should therefore certify the proposed Class and Subclass, and appoint Melvin and his lawyers to represent the Class and Subclass.

## II.    BACKGROUND

### A.    The Genetic Information Privacy Act.

For more than twenty years, Illinois has recognized an individual's significant privacy interest in his or her genetic information, and the need to protect that information from unauthorized disclosure. *See* 410 ILCS 513/5 (expressing legislative intent). These protections are codified in the GIPA, which sets out restrictions on who may access an individual's genetic testing results, and what they are allowed to do with it in at least three distinct ways. 410 ILCS 513/15, 30, 35. First, the GIPA categorically protects genetic information: "genetic testing and information derived from genetic testing is confidential and privileged and may be released only to the individual tested and to persons specifically authorized, in writing in accordance with Section 30, by that individual to receive the information[.]" 410 ILCS 513/15(a).[3] Second, the GIPA, in Section 30, limits the disclosure of the subject of any genetic testing: "[n]o person may disclose … the identity of any person upon whom a genetic test is performed or the results of a genetic test in a manner that permits identification of the subject of the test, except to … [a]ny person designated in a specific written legally effective authorization for release of the test results executed by the subject of the test…" 410 ILCS 513/30(a)(2). Third, the GIPA prohibits the dissemination of genetic information a person provides to an entity: "[n]o person to whom the results of a test have been disclosed may disclose the test results to another person except as

---

[3]    "Genetic testing" is defined as it is in HIPAA: an analysis of human DNA, RNA, chromosomes, proteins, or metabolites, if the analysis detects genotypes, mutations, or chromosomal changes." 45 C.F.R. § 160.103. It is specifically defined to "include[] direct-to-consumer commercial genetic testing," 410 ILCS 513/10.

authorized under this Act." 410 ILCS 513/35. Persons "aggrieved by a violation of this Act" are entitled to bring an action to recover statutory or actual damages, whichever is greater, and for injunctive relief. 410 ILCS 513/40(a).

**B.      Sequencing's Website Shares Data with Third-Party Testers.**

Sequencing operates an online marketplace offering reports on its customers' DNA. (Transcript of Sequencing 30(b)(6) Deposition ("Seq. Tr."), attached as Exhibit 1, at 19:13–20:19.) After a user creates an account, he or she uploads the results from a DNA test taken or stored elsewhere—for example, from 23andMe or Ancestry.com—or completes a DNA test kit that Sequencing sells directly. (*Id.* at 31:15–37:1.) At this point, Sequencing has a copy of its users' DNA test results, a "DNA data file" that include those users' "raw genetic data." (*Id.* at 33:16–37:1.) This data allows for additional DNA analysis, including those that detect and assess genotypes, which is delivered to Sequencing's customers in the form of a report. (*Id.* at 87:25–88:23; 116:5–119:8.) Customers can purchase those reports from Sequencing's "marketplace," with each report assessing a different element of the user's genetic code. (*Id.* at 38:22–42:5.) For example, customers can purchase reports that analyze one's heart health, likely reactions to medications, or risks to develop inherited diseases. Other reports analyze a customer's DNA to provide recommendations on diet or general health improvements. (*See, e.g.* Figure 1 (screenshot of reports available on the marketplace).)



**Figure 1.**

The vast majority of the reports available on the marketplace are provided by third-party developers, not Sequencing. (Seq. Tr. at 44:14–45:5 (estimating that 80% of the marketplace applications are developed by third parties.) A Sequencing customer purchases a report without ever leaving the Sequencing website. (*See* Figure 2 (depicting example of report with a "buy" link from Sequencing's marketplace).)



**Figure 2.**

Reports are also delivered via Sequencing's website. (*See* Figure 3.)



**Figure 3.**

If a user must leave Sequencing's website at any point in the process—and for most reports, they do not—that only occurs after the report has been purchased, the user's genetic information shared, and the third-party analysis run. (Seq. Tr. at 68:7–69:4.)

Sequencing has provided only one screenshot reflecting any language purporting to warn users that their data will be sent to third-party testers outside of Sequencing.com. (*See* Figure 4.) This language is nested in the "Instructions" tab of one analysis provided by a third-party tester, Silverberry Genomix.



**Figure 4.**

While Melvin's position is that this language and its presentation is insufficient consent, for those who purchased a report generated by Silverberry Genomix, that sufficiency can be assessed

for everyone in the Subclass at once.

So that the third-party testers can access the DNA data they need to run their analyses, Sequencing utilizes an "application program interface" (the "App Market API") that operates as a data pipeline between Sequencing and the third-party tester. (*See* Seq. Tr. at 45:19–47:4; 48:3–49:16.) When a user purchases or runs a report from a third-party tester, that user's genetic test results (or the subset thereof needed for the analysis) are transmitted, along with other identifying information (name and email address) to the third-party application via the App Market API so that the requested analysis can be performed. (*See* Figure 5 (screenshot from Sequencing website reflecting data sent to the developer); *see also* Seq. Tr. at 58:20–61:8; 71:5–23.)



API Overview

The App Market API is designed to be quick, easy and painless for you to integrate into your site.

When you use the API, this is what will occur at Sequencing.com

- Your app is marketed and sold in Sequencing.com's App Market
- When a user purchases your app, your app will be added to the user's My Apps page along with a 'Start' button. The user can then use your app at any time.
- When user clicks 'Start', the user will be able to select a genetic data file stored in his or her Sequencing.com account.
  - You can also have the option to have the user provide non-genetic information, such as data your app requires. This can be any non-genetic information such as the user's age, gender, BMI, height, weight, etc.
- Sequencing.com will send your system a secure API call letting your system know that a user has submitted a genetic data file for processing that will include:
  - security authentication
  - identification of the app
  - identification of the app user
  - secure access to the app user's genetic data
  - any non-genetic information provided by the user (optional)

**Figure 5.**

The third-party tester then sends the results, or notification that the results are ready, back to Sequencing and the user through the App Market API. (Seq. Tr. at 55:3–18.) The App Market API was the only operational API that Sequencing made available to third-parties and it was used for every report that third-parties ran for the entire Sequencing customer base. (*See id*. at 45:19–47:4; 48:3–49:16) From a user's perspective, there are no material variations in the process to provide Sequencing a DNA data file, purchase any analyses, or access the reports that

are generated. (*Id.* at 68:20–69:7; 80:20–25; 100:11–101:14.)

### C. Plaintiff's Experience and Procedural History.

Melvin created an account with Sequencing in early 2020, uploaded his genetic information to Sequencing, and purchased several genetic reports from Sequencing. (Dkt. 1-1 ¶ 24.) After he purchased these reports, he learned that they were conducted by third-party testers, including that at least one report was generated by Silverberry Genomix, and that his genetic test results were sent to these third parties as part of generating these reports. (*Id.* ¶ 25.) Melvin contends that it was not apparent whether or how his testing results were being shared. (*Id.* ¶ 27.) He did not authorize Sequencing to share his genetic testing results, or any other information, with the third-party testers that ultimately produced these reports. (*Id.* ¶ 28.) In early 2021, Melvin filed this case, alleging violations of the GIPA on behalf of himself and the Class and Subclass that he requests the Court certify, and seeking statutory damages for each violation. (*Id.* ¶ 43.)

## III. ARGUMENT

To merit certification, a proposed class must meet the requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy. *See* Fed. R. Civ. P. 23(a). Because Melvin seeks to recover money damages on behalf of the Classes, he seeks certification under Rule 23(b)(3). *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 350, 362 (2011). He must therefore demonstrate that the proposed Classes meet Rule 23(b)(3)'s requirements of predominance and superiority. A Rule 23(b)(3) class also must be ascertainable, that is, defined by objective criteria. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015). "[T]he office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the method best suited to adjudication of the controversy fairly and efficiently." *Amgen Inc. v. Conn.*

*Retirement Plans & Tr. Funds*, 568 U.S. 455, 460 (2013) (cleaned up). Nevertheless, "[b]y its terms [Rule 23] creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010). As explained below, Melvin's proposed Classes meet every one of these prerequisites and should therefore be certified.

### A. The Class and Subclass Are Sufficiently Numerous.

Rule 23(a)(1) requires that a proposed class contain so many members that "joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[N]o magic number exists for satisfying the numerosity requirement," but a class of 40 members is generally sufficient. *Barnes v. Air Line Pilots Ass'n, Int'l*, 310 F.R.D. 551, 557 (N.D. Ill. 2015). Sequencing maintains its customers' purchase records, so Sequencing knows which reports each customer purchased, when, and how often each report was run. (Seq. Tr. at 85:12–15; 86:21–87:16.) They also record the customer's IP address, so that they know where these individuals are located. (*Id.* 91:5–24.) Based on that information, Sequencing admits that there are likely more than 500 individuals in Illinois who have used Sequencing's services to purchase a report on the marketplace, and had their genetic information shared with third-party testers. (*Id.* at 92:1–5.) Sequencing's CEO later confirmed that at the time this lawsuit was filed, Sequencing had registered 1,550 users with an IP address in Illinois. (Declaration of Michael Ovca ("Ovca Decl."), attached hereto as Exhibit 2, ¶ 5.) Of those, 869 users uploaded and stored one or more data files on Sequencing's website. (*Id.*) At the time that Plaintiff filed the complaint, Sequencing utilized Silverberry Genomix to generate nearly a dozen different reports, a number that has grown to nearly two dozen as of this filing. (*See id.* (reflecting compilation of Silverberry Genomix reports available in 2021)); https://sequencing.com/reports? (reflecting current reports available). Based on Silverberry

Genomix's percentage-share of all reports that Sequencing offered, the Subclass also exceeds 40 members. The proposed Classes therefore easily clear this minimal numerosity requirement.

**B.      Every Aspect of the Case Turns on Sequencing's Uniform Conduct, Ensuring Common Questions of Law and Fact Predominate.**

Next, Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). A common question is one that can be resolved "in one stroke" for the Class on the basis of common evidence. *Bell v. PNC Bank, N.A.*, 800 F.3d 360, 374 (7th Cir. 2015) (citing *Dukes*, 564 U.S. at 350) (noting that a common question is one that is "capable of class-wide resolution" such "that determining the truth or falsity of the common contention will resolve an issue that is central to the validity of each claim"). Insofar as Rule 23(a)(2) is concerned, "even a single common question will do." *Dukes*, 564 U.S. at 359 (cleaned up). Courts typically conclude that commonality is satisfied when "the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members[.]" *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014). "[T]he critical point is the need for conduct common to members of the class." *Id.* at 756 (quotation marks omitted); *Dukes*, 564 U.S. at 350 ("What matters to class certification … [is] the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.") (quotation marks omitted). When "the defendant's allegedly injurious conduct differs from plaintiff to plaintiff . . . no common answers are likely to be found." *Suchanek*, 764 F.3d at 756. But when "the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members," class treatment is appropriate. *Id.* This is particularly true when uniform statutory damages are being sought for all class members. *See, e.g.*, *Rogers v. BNSF Ry. Co.*, 19 C 3083, 2022 WL 854348, at *4 (N.D. Ill. Mar. 22, 2022) ("The Court concludes that this case is well-suited for class treatment, especially because the claims involve uniform statutory damages[.]").

Relatedly, Rule 23(b)(3) requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "Rule 23(b)(3)'s predominance requirement is satisfied when common questions represent a significant aspect of a case." *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 815 (7th Cir. 2012) (cleaned up). "Individual questions need not be absent. The text of Rule 23(b)(3) itself contemplates that such individual questions will be present. The rule requires only that those questions not predominate over the common questions affecting the class as a whole." *Id.* "In this case," as in many others, "the question of commonality and predominance overlap in ways that make them difficult to analyze separately." *See Bell*, 800 F.3d at 374. As such, we analyze them together here.

Melvin's GIPA claim invokes three key sections of the GIPA. First, Section 15 provides that "except as otherwise provided in this Act, genetic testing and information derived from genetic testing is confidential and privileged and may be released only to the individual tested and to persons specifically authorized, in writing in accordance with Section 30, by that individual to receive the information." 410 ILCS 513/15(a). Second, Section 30 states that "[n]o person may disclose … the results of a genetic test in a manner that permits identification of the subject of the test[.]" 410 ILCS 513/30(a). Third, Section 35 mandates that "[n]o person to whom the results of a test have been disclosed may disclose the test results to another person except as authorized under this Act." 410 ILCS 513/35. Disclosure of test results may be permitted only to the person "designated in a specific written legally effective authorization for release of the test results executed by the subject of the test." 410 ILCS 513/30(a)(2). Determining whether Sequencing failed to comply with any of these sections raises common questions on behalf of all Class and Subclass members, respectively, that will be answerable based on common evidence—

namely, the preprogrammed workflow of Sequencing's website, which operates the same way for both its users and third-party testers.

*Did Sequencing have Class members' genetic testing results?*

As relates to each of these GIPA sections, whether Sequencing had Class members genetic testing results, thereby triggering GIPA's protections, is a common question. To obtain reports through Sequencing, customers must provide Sequencing the results of a DNA test, whether that testing is conducted by Sequencing or a different genetic testing service like 23andMe. (Seq. Tr. at 31:18–32:8; 35:22–37:1.) No matter who performs these initial tests, Sequencing refers to this as "raw genetic data." (*Id.*) This common referent is no mistake: regardless of where a DNA testing report comes from, it produces the same basic information that permits further analysis of an individual's DNA. (*Id.* at 32:18–34:17; 35:22–36:3.) Therefore, whether this information constitutes "the results of a genetic test" per the GIPA is a question with a common, classwide answer.

*Has a disclosure of genetic information occurred?*

Each GIPA section that Melvin invokes turns on the disclosure of genetic information. The evidence shows that third-party testers generate specific reports based on an individual's DNA tests by using Sequencing's API to access a customer's DNA test results. (*Id.* at 41:20–42:5; 49:4–50:16; 59:9–60:13.) During the class period, only one API was used by Sequencing, meaning that every third-party DNA tester accessed Class Members' test results in the same way. (*Id.* at 45:19–24; 101:5–14.) Whether that access constituted a disclosure, therefore, is a question with a common, classwide answer.

*Did the disclosure allow for third parties to identify the test subject?*

Melvin's Section 30 claim is based on the prohibited disclosure of information that

12

allows a third party to identify the subject of a genetic test. Whether sufficient identifying information was turns on the uniform functionality of the API. This will answer for all Class members what identifying information was sent—such as email address, name, or user identity— that would allow test results to be connected (or not) to an individual Sequencing user.[4] (*Id.* at 59:9–61:8; Figure 2, *supra*.) This is therefore another question with a common, classwide answer.

<u>*Did sequencing obtain the required written authorization to disclose test results?*</u>

Whether Sequencing obtained the required written authorization to disclose test results to third parties bears on each of the above GIPA sections. This too is answerable by common evidence for all Class members: all Class members followed the same process to sign up for Sequencing, and purchase reports through Sequencing. (Seq. Tr. at 68:2–69:7.) If any step in that process generated the necessary written authorization it will have been generated for each Class member. This will include the applicability of any purported acknowledgements or checkboxes, including those added into Sequencing's workflow after this litigation began. (*See id.* at 74:9– 77:2.)

The need to answer this question also requires the creation of the proposed Subclass. As explained above, although Sequencing produced no other language for any other reports that put a purchaser on notice that DNA testing results were being transmitted to third parties,

---

[4]     Sequencing's website and developer documentation, including the technical explanation of the data sent in connection with any given API job has consistently reflected that identifying information, like name and email, was sent with every call. *See, e.g.*, https://web.archive.org/web/20200806191827/ https://sequencing.com/developer-documentation/api-guides/app-market-api (snapshot of App Market API documentation from 2020); (Seq. Tr. at 52:23–53:14; 62:18–63:4). Sequencing attempted to distance itself from this, claiming that this type of identifying information was not sent, (*id.* at 54:22–55:18), despite acknowledging that the website documentation was the best evidence available to identify how the API worked and what data it used, (*id.* at 58:8–59:13; 62:18–65:12). Unfortunately, any logs that would have reflected the specific data that was transferred were destroyed in connection with normal document destruction policies, which were not suspended during the litigation. (*Id.* at 55:19–57:13.)

Sequencing may argue that the pages of reports generated by Silverberry Genomix did contain some language that might purportedly put a customer on notice. (*See* Figure 5, *supra*.) Melvin contends that this disclaimer was not conspicuous (indeed, a user would not necessarily even see the disclaimer when purchasing the report) and that it is insufficient in any event to make the purchase of a report itself a written release. But regardless, every member of the Subclass that purchased a report generated by Silverberry Genomix was arguably exposed to this language. Thus, resolving whether it is sufficient to satisfy the GIPA can be done in a single merits proceeding for the entire Subclass.

### *Was any disclosure of genetic information otherwise permitted by the GIPA?*

Section 35 prohibits an entity to whom an individual has disclosed genetic test results (*i.e.*, Sequencing) from further disclosing the results to anyone else "except as authorized under this Act." 410 ILCS 513/35. Because Sequencing operates the same way and provides the same services for all of its customers, any rationale that Sequencing could point to—including any written consent it obtained—allowing for the disclosure would be the same with respect to all Class members. Thus, this is another question answerable for all Class members with common evidence.

### *What damages are Class members entitled to?*

Finally, determining what damages Class members are entitled to is resolvable on a classwide basis. Sequencing's workflow didn't operate uniquely for any customer, including Melvin, meaning that any GIPA violations therein would entitle all Class members to the same statutory damages per violation—either $2,500 for negligent violation or $15,000 for reckless or intentional violations.

Because the same nucleus of common evidence will resolve all of the major merits

questions in this case for every Class and Subclass member, the commonality and predominance criteria are met.

### C. Melvin's Claims Are Typical of the Class and Subclass.

A putative class representative also must demonstrate that their claims are typical of the claims of the class they seek to represent. Fed. R. Civ. P. 23(a)(3). A plaintiff is typical of the class when there is "enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano v. The Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011); *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 597 (7th Cir. 1993) (citation omitted) (examining "whether the named representatives' claims have the same essential characteristics as the claims of the class at large"). Where a named plaintiff's claim "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and is based on the same legal theory," typicality is satisfied. *Bernal v. NRA Grp., LLC*, 318 F.R.D. 64, 74 (N.D. Ill. 2016) (quoting *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009).

Here, the "essential characteristics" of Melvin's claims and those of the Class and Subclass he seeks to represent are practically identical. As discussed above, Melvin, like every other Class member, provided his genetic information to Sequencing. (Seq. Tr. at 96:10–22.) And like every other putative Class member, he purchased a DNA analysis on the application marketplace. (*Id.* at 96:23–97:7.) This resulted in information being sent to a third party via the same API that was used for every third-party application on the marketplace. (*Id.* at 97:8–22.) As Sequencing's CEO recognized, there would be no reason that Melvin's experience would be unique from any other Sequencing customer. (*Id.* at 100:11–101:14.) Melvin also purchased a report on Sequencing.com that was generated by Silverberry Genomix, meaning he is a member

of the Subclass, (*See* Exhibit 2-B to Ovca Decl. (reflecting applications that Melvin purchased, including from Silverberry Genomix), with the same interests to litigate the case on the Subclass' behalf, too. Because Sequencing's conduct here did not, by design, vary between Class members, it's no surprise that his claims will "stand or fall on the same facts as the claims of the putative [C]lass members." *Ziemack v. Centel Corp.*, 163 F.R.D. 530, 534 (N.D. Ill. 1995). Typicality is therefore satisfied.

### D. Melvin and His Counsel Will Adequately Represent the Class and Subclass.

Rule 23(a) also requires that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4); *see also* Fed. R. Civ. P. 23(g) (setting out factors to consider when appointing class counsel). Adequacy of representation has two parts: "the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest' of the class members." *Starr v. Chi. Cut Steakhouse, LLC*, 75 F. Supp. 3d 859, 874 (N.D. Ill. 2014) (quoting *Retired Chi. Police Ass'n*, 7 F.3d at 598). "To be an adequate representative, the named [plaintiff] must not have 'antagonistic or conflicting claims.'" *Id*.

In this case, Melvin is a member of both the Class and Subclass and seeks the same relief as every other Class member. Thus, his interests are coextensive with theirs. *See Bernal*, 318 F.R.D. at 75. He has demonstrated his commitment to pursuing those interests by filing this lawsuit as a putative class action, rather than an individual action; actively participating in multiple rounds of discovery, including searching for and producing responsive documents; strategizing with his attorneys; and reviewing pleadings and other filings. (Ovca Decl. ¶ 6.) Melvin satisfies the adequacy requirement. *See Jackson v. Nat'l Action Fin. Servs., Inc.*, 227 F.R.D. 284, 289 n.6 (N.D. Ill. 2005) ("[P]laintiff has sufficient interest in the outcome of his suit

16

—namely, the recovery of damages—to ensure vigorous advocacy.").

Melvin has also retained able counsel well positioned to represent the Class and Subclass. Each factor set out in Rule 23(g) support's appointing Melvin's attorneys as Class Counsel. *See* Fed. R. Civ. P. 23(g)(1)(A) (instructing courts to consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class). Melvin's counsel "are experienced and respected members of the plaintiff's class action bar . . . [who] have extensive experience litigating consumer class actions." *Aranda v. Carribbean Cruise Line, Inc.*, No. 12-CV-4069, 2017 WL 818854, at *4 (N.D. Ill. Mar. 2, 2017). Attorneys at Edelson PC have been appointed class counsel in some of the largest technology- and privacy-based class actions in the country, including in connection with the first adversarially certified BIPA class action, *In re Facebook Biometric Info. Priv. Litig.*, 326 F.R.D. 535 (N.D. Ill. 2018) (*see* Edelson PC Firm Resume, attached as Exhibit 2-A to the Ovca Decl.). This year alone, Law360 has named the firm's founder a "Titan of the Plaintiffs Bar"[5] and recognized Edelson as a "Cybersecurity and Privacy Group of the Year."[6] Just before that, in a nod to the firm's headquarters in Chicago, Edelson was named one of six "Illinois Powerhouse" firms for three years in a row, alongside Kirkland & Ellis, Sidley Austin, Mayer

---

[5]     Laura Berg, *Titan of the Plaintiffs Bar: Jay Edelson*, LAW360 (Apr. 26, 2023), https://www.law360.com/articles/1596891/titan-of-the-plaintiffs-bar-edelson-s-jay-edelson; *see also* Emma Whitford, *Titan of the Plaintiffs Bar: Jay Edelson*, LAW360 (Mar. 31, 2021), https://www.law360.com/articles/1364448/titan-of-the-plaintiffs-bar-edelson-s-jay-edelson; Allison Grande, *Titan of the Plaintiffs Bar: Jay Edelson*, LAW360 (Oct. 1, 2014), https://www.law360.com/articles/581584/titan-of-the-plaintiffs-bar-jay-edelson.
[6]     Parker Quinlan, *Cybersecurity & Privacy Group Of The Year: Edelson*, LAW360 (Feb. 21, 2023), https://www.law360.com/articles/1567512/cybersecurity-privacy-group-of-the-year-edelson.

Brown, Dentons, and Jenner & Block.[7] Edelson has been the only plaintiffs' firm, as well the only firm with fewer than 100 attorneys, to make that list. That Edelson PC has been found to be adequate class counsel in numerous other cases in this Court and across the country is "persuasive evidence" that they will be adequate again. *Gomez v. Ill. State Bd. of Educ.*, 117 F.R.D. 394, 401 (N.D. Ill. 1987); *see also Matthews v. United Retail, Inc.*, 248 F.R.D. 210, 215 (N.D. Ill. 2008) ("[E]xperience as class counsel in similar cases weighs in favor of a finding that class counsel here is adequately competent and experienced.").

As relates to this case specifically, Melvin's attorneys have demonstrated their commitment to the case, investigating the workflow of Sequencing's website, how the API operates, what information is sent to third parties, and potential liability on Sequencing's part. (Ovca Decl. ¶¶ 4-5.) After filing the case, they engaged in motion practice, successfully defeating Sequencing's motion to compel arbitration. (Dkt. 18.) They next engaged in the discovery process, developing the factual record and deposing Sequencing. (Ovca Decl. ¶ 5.) In short, the firm has invested substantial resources into the investigation and prosecution of this matter, and will continue to do so throughout its duration. (*Id.* ¶ 3.)

Finally, there is no barrier to a single representative and counsel for both the Class and Subclass because the two groups do not have antagonistic interests. The Subclass is defined to permit litigation of a single, additional question potentially relevant to the merits, but both the Class and the Subclass seek to hold Sequencing liable under the GIPA for materially identical conduct. Unitary representation is therefore permissible, and, arguably, preferable, since it will

---

[7]     Lauraann Wood, *Illinois Powerhouse: Edelson*, LAW360 (Sept. 3, 2019), https://www.law360.com/articles/1193728/illinois-powerhouse-edelson; Diana Novak Jones, *Illinois Powerhouse: Edelson PC*, LAW360 (Aug. 28, 2018), https://www.law360.com/articles/1076447/illinois-powerhouse-edelson-pc; Diana Novak Jones, *Illinois Powerhouse: Edelson PC*, LAW360 (October 5, 2017), https://edelson.com/wp-content/uploads/2016/05/Illinois-Powerhouse-Edelson-PC.pdf.

create efficiencies with respect to the vast majority of issues that overlap between the Class and Subclass.

The adequacy of representation element is therefore satisfied.

**E.     A Class Action Is the Superior Method for Resolving This Controversy.**

Finally, there can be little doubt that a class action is the best way to resolve this case. This requirement "is intended to cover cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Birchmeier v. Carribean Cruise Line, Inc.*, 302 F.R.D. 240, 255 (N.D. Ill. 2014) (internal quotation omitted). Rule 23(b)(3) sets forth four matters "pertinent" to the determination that a class action is superior. Each supports certification here.

The first and second factors, individual Class members' interests in individually controlling the action and the extent and nature of other litigation, Fed. R. Civ. P. 23(b)(3)(A), (3)(B), weigh in favor of certification because there is no indication that any Class members have sought to pursue their case on their own; this is the only case on record alleging GIPA claims against Sequencing. *See* Toney v. Quality Res., Inc., 323 F.R.D. 567, 593 (N.D. Ill. 2018) ("[T]he record is lacking in evidence that another class member seeks to individually control a separate action[.]"); 2 NEWBERG ON CLASS ACTIONS § 4:69 (6th ed. 2022) (noting that courts generally conclude a lack of similar suits militates in favor of class status). Additionally, the fact that the statutory damages available are nominal compared to the costs of litigating any individual action otherwise supports finding that the class mechanism is superior. *See* Am. Exp. Co. v. Italian Colors Rest., 570 U.S. 228, 245 (2013) (Kagan, J., dissenting) ("No rational actor would bring a claim worth tens of thousands of dollars if doing so meant incurring costs in the hundreds of

19

thousands.").

Next, it is desirable to concentrate this litigation in this forum. *See* Fed. R. Civ. P. 23(b)(3)(C). All claims arise under Illinois law, the proposed Class is made up solely of Illinoisans, and Sequencing makes its products available to Illinoisans. *See Barnes*, 310 F.R.D. 551 at 562 (considering third superiority factor met where defendant was located and conduct occurred in this District). "[C]oncentrating the litigation in a single forum will promote judicial economy, prevent duplicative litigation, and avoid potentially inconsistent results." *Hayes v. Convergent Healthcare Recoveries, Inc.*, No. 14-1467, 2016 WL 5867818, at *10 (C.D. Ill. Oct. 7, 2016) (citation omitted).

The fourth factor—"the likely difficulties in managing a class action," Fed. R. Civ. P. 23(b)(3)(D)—also weighs in favor of certification. This conclusion flows naturally from the clear predominance of common issues and the fact that Sequencing maintains key records regarding Class membership, including the IP addresses of its customers, what purchases they made, when, how often they ran reports, as well as those customers' contact information. *Bernal*, 318 F.R.D. at 76; *see also* 2 NEWBERG ON CLASS ACTIONS § 4:72 (6th ed. 2022) ("Courts generally hold that if the predominance requirement is met, then the manageability requirement is met, as well."). All of this will assist in the notice and claims administration processes, limiting manageability concerns. And even if class proceedings provide some challenges, "manageability is almost never a bar to class certification." *Practice Mgmt. Support Servs., Inc. v. Cirque du Soleil, Inc.*, No. 14 C 2032, 2018 WL 1255021, at *12 (N.D. Ill. Mar. 12, 2018) (citation omitted); *see also Mullins*, 795 F.3d at 664 ("Refusing to certify on manageability grounds alone should be the last resort.").

More generally, Rule 23's superiority standard requires that the court recognize "the

costs *and benefits* of the class device." *Id.* at 663 (emphasis in original). Here, requiring individual cases "would make no sense," because "each class member here would entail the same discovery and require multiple courts to weigh the same factual and legal bases for recovery." *Bernal*, 318 F.R.D. at 76. Resolving all class members' claims in a single proceeding, therefore, generates economies of time and expense and promotes uniformity of decision, without risking any procedural unfairness. *See Birchmeier*, 302 F.R.D. at 255. Rule 23's superiority requirement is satisfied.

### F. The Proposed Class and Subclass Are Ascertainable.

Finally, the proposed Class and Subclass meet Rule 23's implicit "ascertainability" requirement, which "requires that a class . . . be defined clearly and based on objective criteria." *Mullins*, 795 F.3d at 659. The Class definition here satisfies this requirement because it based solely on objective criteria: an individual is either located in Illinois or not; a person's genetic information was either shared with a third-party, or it was not. Likewise, a person either purchased a report that was generated by Silverberry Genomix, or they did not. Thus, the Subclass is ascertainable as well. The Class and Subclass are therefore ascertainable and may be certified.

## IV. CONCLUSION

The proposed Class and Subclass satisfy all the requirements in Rule 23(a) and (b)(3). This Court should grant the motion to certify the Classes, appoint Melvin to represent the Classes, and appoint his lawyers as Class counsel.

Respectfully submitted,

**DAVID MELVIN**, individually and on behalf of all others similarly situated,

21

Date: May 5, 2023

/s/ Michael W. Ovca

Benjamin H. Richman
brichma@edelson.com
Roger Perlstadt
rperlstadt@edelson.com
Michael W. Ovca
movca@edelson.com
EDELSON PC
350 N. LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel. 312-561-4106
Fax. 312-589-6378

*Counsel for Plaintiff David Melvin and the Putative Class*